GAMBURG & BENEDETTO, LLC
BY: DONALD BENEDETTO, ESQUIRE
I.D. NO. 309199
1500 JOHN F. KENNEDY BLVD
SUITE 1203
PHILADELPHIA, PA 19102
(215) 567-1486
ATTORNEY FOR PLAINTIFF: REHOBOTH PETROLEUM INC.

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REHOBOTH PETROLEUM INC. : | |
| Plaintiff, : | |
| vs. : | |
| PETROLEUM MARKETING GROUP INC. & : | CASE NO. 25-3746 |
| PMIG DPNJ LLC. : | |
| Defendants. : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A
<u>PRELIMINARY INJUNCTION</u>**

I. <u>INTRODUCTION</u>

Plaintiff operates a Gulf gas station located at 201 Lancaster Ave., Devon, PA 1933. They purchased the station for $360,000.00 from its prior operator. Its operation is subject to a Commission Agent Agreement between Plaintiff and both Defendants. The Agreement contains a provision permitting the Defendants to terminate the Plaintiff's rights to operate the station upon 30 days' notice and without cause. The plaintiff has received said notice from the Defendants with an effective date of August 6, 2025. The 30-day provision and termination by the Defendants is in violation of the Petroleum Marketing Practices Act.

## II.   FACTS

Plaintiff, Rehoboth Petroleum Inc., (hereinafter "Rehoboth") is a Pennsylvania Corporation which operates a Gulf gas station and Circle K Market located at 201 Lancaster Ave., Devon, PA 1933 (hereinafter the "Premises"). Defendant, Petroleum Marketing Group Inc., is believed to be the holder of a license/franchise or other authorization to operate both a Gulf Gas Station and Circle K Market.  Defendant PMIG DPNT LLC., is believed to be an affiliated entity of Petroleum Marketing Group Inc., and is the owner of the real property located at 201 Lancaster Ave., Devon, PA 19333.  Collectively the defendants are referred to as "PMG."

*The Agreement Between PMG and Rehoboth*

The parties are collectively parties to a "Commission Agent Agreement" (hereinafter the "Agreement") dated July 30, 2024.  **A copy of the Agreement and its attachments are attached hereto as Exhibit "A."**  The term of the Agreement is from February 1, 2025, until January 31, 2028.  The Agreement at Section 7 includes the following provision: "PMG in its sole discretion has the option to terminate this Agreement at any time and without cause upon thirty (30) days' written notice to Agent."  See Exhibit "A."

Under the Agreement, Rehoboth is identified as the "Agent" and Defendants are collectively identified as "PMG."  The Agreement states that it "describes the relationship between an independent contractor ("Agent") retained to operate a company-owned and/or operated service station."  The Agreement contains various purported waivers of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et seq., and state franchise laws.  The Agreement also states that it does not create a franchise agreement between the parties.

Under the terms of the Agreement, PMG would supply petroleum products to Rehoboth which would in turn be sold at the Premises.  PMG retains the risk of loss for the petroleum products sold at the Premises.  Under the terms of the Agreement, PMG authorizes Rehoboth to utilize various trademarks in connection with the sale of petroleum products.  Rehoboth would not actually purchase the gasoline, but would rather sell it on behalf of PMG at pricing and conditions set by PMG.

In exchange for selling PMG's products, Rehoboth would receive five cents ($.05) per gallon sold.  Under the terms of the Agreement, Rehoboth was also required to pay rent for the premises in the amount of $10,437.00 per month during the first contract year.  The rents thereafter escalated under the terms of the Agreement on an annual basis.  Under the terms of the Agreement, PMG paid the property taxes imposed on the premises, while Rehoboth was responsible for all other expenses such as utilities and most maintenance at the Premises.

*Rehoboth's Acquisition of the Business*

Rehoboth is made up of two shareholders, Vishu Goyal and Philip Samuel.  Rehoboth purchased what it believed to be a gas station dealership from a party named Sami K. Sami on January 29, 2022.  The sale of the business was publicly advertised by a business broker advertising its availability.  Based on this advertisement, Goyal and Samuel learned about the business and ultimately purchased it.  The broker received a commission in connection with the sale of the business.

The total purchase price, paid in full by Goyal and Samuel to the Seller, was Three Hundred and Sixty Thousand Dollars ($360,000.00).  **Attached hereto as Exhibit "B" is the bill of sale for the purchase.**  PMG approved of the transfer of the business to the

shareholders of what ultimately became Plaintiff Rehoboth. Other than completing a credit application with PMG, the members of Rehoboth received little documentation related to the purchase. PMG knew or should have known that the business was being sold for a large sum because its sale was being publicly advertised by the seller and they approved of Rehoboth's acquisition of the business.

In 2025, PMG presented Rehoboth with the current Agreement which they executed. The members of Rehoboth do not have in their possession the prior Agreement that was in force prior to the present Agreement. At all times, both during their purchase of the business and during the execution of the present Agreement, the members of Rehoboth were not represented by counsel.

*Operation of the Business and Termination Notice*

Vishu Goyal and his sister Rashi largely operate the business themselves. Rashi often works from the station's opening until closing, regularly working 12+ hour days, sometimes 7 days a week. Despite the long hours, the members of Rehoboth have a loyal clientele and are beloved in the community. Customers regularly stop by for extended periods purchasing coffee and other items while talking with Rashi and others at the station.

Rehoboth has operated the business largely without incident since taking over in 2022. Suddenly, and without any prior indication, PMG sent Rehoboth a "Notice of Termination" on July 7, 2025. **A copy of the Notice is attached hereto as Exhibit "C."** The notice states "Pursuant to section 7 of CA (Duration), PMG has the option to terminate this CA at any time and without cause by giving Agent thirty (30) days advance written notice. This letter is to inform you that effective as of August 6, 2025 (the "Effective Date") the CA Agreement

between PMG and Agent shall be terminated." Despite efforts by Rehoboth, no further explanation for the termination was forthcoming.

### III.     LEGAL ARGUMENT

*The Petroleum Marketing Practices Act*

In 1978, Congress enacted Title I of the PMPA to protect petroleum franchisees from "arbitrary termination or nonrenewal of their franchises." *Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 360 (4th Cir. 1986). Central to the concern of Congress was the use by franchisors of contract termination as a remedy for contract violations. As the legislative history indicates: "Commonly the franchisor is able to capitalize on his disparity of bargaining power to obtain great flexibility with respect to his rights to terminate the contractual relationship. As a result, termination of franchise agreements during the term as a remedy for contract violations has been repeatedly utilized." S. Rep. No. 731, 9th Cong., 2nd Sess. 18, reprinted, 1978 U.S. Code Cong. & Admin. News 873, 875-77.

The PMPA "specifically set[s] forth the permissible grounds for termination or nonrenewal of franchise relationships, and bestow[ing] on federal courts jurisdiction to remedy violations of the Act." *Doebereiner v. Sohio Oil Co.,* 880 F.2d 329, 332 (11th Cir. 1989), amended on den. of pet. for reh., 893 F.2d 1274 (11th Cir. 1989). Under the PMPA, the termination or nonrenewal of a petroleum franchise is barred unless the termination or nonrenewal meets specific statutory justifications. *Darling v. Mobil Oil Corp.,* 864 F.2d 981, 984 (2nd Cir. 1989). As described in *Bridges Enters. v. Exxon Co. U.S.A.*, 820 F.2d 123, 124 (5th Cir. 1987), "[t]he statute is exclusive: a franchisor may terminate or nonrenew a franchise only if its

action is based on a permitted ground, and only if the stringent notification requirements of Section 2804 have been met." *See also, Barnes v. Gulf Oil Corp.,* 795 F.2d at 361.

Under Section 2804(a), termination of a franchise relationship may not occur absent 90 days notice and for cause. 15 U.S.C. §2804(a). Also, importantly in this matter, "[n]o franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive" any rights it may have under the PMPA. 15 U.S.C. §2805(f)(1). The burden of proof to the franchisor to show that the termination was in compliance with the PMPA. 15 U.S.C. 2805(c). The effect of this shift in burdens is to "create a presumption that any termination of a franchise is unlawful." *Sun Ref'g & Marketing Co. v. Rago,* 741 F.2d 670, 672 (3d Cir. 1984).

*Defendants are "Franchisors" for Purposes of 15 U.S.C. §2802(a)*

Section 2802 prevents a "Franchisor" from terminating a franchise agreement absent enumerated cause and upon 90 days notice. A "Franchisor" is defined as "a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. §2801(3). Section 2801 (6) defines "Distributor as "any person, including any affiliate of such person, who…purchases motor fuel for sale, consignment, or distribution to another."

A plain reading of the Agreement between Plaintiff and Defendants show that the Defendants fit the definition of a "Distributor" under the terms of the PMPA. Section 1 of the Agreement states that it will supply various gasoline and diesel fuel products (motor fuel) to the Plaintiff at the Premises. Accordingly, because the Defendants are a Distributor of motor fuel, they are a "Franchisor" within the meaning of the PMPA.

*The Agreement is a Franchise Agreement*

Section 2801(1) of the PMPA states that a "Franchise" is any contract "(i) between a refiner and a distributor, (ii) between a refiner and a retailer, (iii) between a distributor and another distributor, or (iv) between a distributor and a retailer… under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use."  15 U.S.C. §2801(1)(A).

Further, the term "Franchise" also includes "any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy."  15 U.S.C. §2801(1)(B).

Section 6 of the Agreement provides for the authorization of Plaintiff to use trademarks which are either owned or controlled by a refiner.  Further, Section 8 of the Agreement sets forth the rents payable to the Defendants, $10,437.00 per month during the first contract period, by the Plaintiff.[1]  A Franchise agreement exists within the meaning of the PMPA unders both Section 2801(1)(A) and (B).  Under Section 2801(A), a contract exists between a distributor and retailer, that permits the retailer to use a trademark in connection with the sale of motor fuel.  In addition,

---

[1] Illustrative of the disparity between the parties in this matter, Section 6 also permits the Defendants to the right to "adjust the agreed monthly rent specified in paragraph 8(a) at any time after the first Contract Year, regardless of whether such adjustment may occur at the commencement of or during any Contract Year."

Section 2801(1)(B) is applicable because Plaintiff leases the premises from the Defendants specifically for the sale of motor fuel.

*Plaintiff is a Retailer within the Meaning of the PMPA*

The Agreement drafted by the Defendants is a clever attempt to circumvent the protections of the PMPA as it characterizes the Plaintiff as an "Agent" and not a Retailer. The Agreement states in bold type the following:

> **THIS AGREEMENT DESCRIBES THE RELATIONSHIP BETWEEN AN INDEPENDENT CONTRACTOR ("AGENT") RETAINED TO OPERATE A COMPANY-OWNED AND/OR OPERATED SERVICE STATION. THE PARTIES TO THIS AGREEMENT AGREE AND ACKNOWLEDGE THAT AT ALL TIMES, THE AGENT REMAINS A CONTRACTOR HIRED TO SELL PMG'S PETROLEUM PRODUCTS ON PMG'S TERMS IN EXCHANGE FOR A COMMISSION ON THOSE SALES FROM WHICH THE AGENT MUST PAY CERTAIN EXPENSES.**

Regardless of such disclaimers by the Defendants, the Plaintiff is a "Retailer" as defined under 15 U.S.C. §2801(7) and as a result, the PMPA is fully enforceable against the Defendants and applicable to the interpretation of the Agreement between the parties. Section 2801(7) states that a "Retailer" is "any person who purchases motor fuel for sale to the general public for ultimate consumption."

It is conceded that the Plaintiff does not purchase motor fuel from the Defendants under the Agreement, however a party can be considered a "constructive retailer" for purposes of the PMPA. *See generally Farm Stores, Inc. v. Texaco, Inc.,* 763 F.2d 1335 (11th Cir. 1985); *A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC,* 2018 U.S. Dist. LEXIS 219308 (E.D.N.Y. Mar. 5, 2018)(Unpublished). In looking at if a party is a constructive retailer, Courts look to if they have an "indicia of entrepreneurial responsibility." *Farm Stores,* 763 F.2d at 1346.

The contract at issue in *Farm Stores* was quite similar to the contract at issue in the present matter. It contained bold faced waivers of the PMPA and statements that no franchise relationship existed. *Id.* at 1338. The *Farm Stores* Court found that Plaintiff in that matter was not a purchaser of motor fuels within the meaning of the PMPA. *Id.* at 1340. It therefore rationed that Farm Stores did not fit within the statutory language of the PMPA. *Id.* at 1341.

In finding that Farm Stores was also not a constructive retailer through the entrepreneurial theory adopted by the District Court in that matter, the *Farm Stores* Court found that Texaco bore all the risk *Id.* at 1344-45. *See also Hardwick v. Nu-Way Oil Co.,* 589 F.2d 806 (5th Cir. 1979)(analyzing independent business responsibility). Farm Stores, in addition to not purchasing gasoline, did not pay rent, Texaco paid for the construction and maintenance of the premises and bore all of the entrepreneurial risk. *Id.* 1345.

Although not precedential, courts faced with similar situations to the present case have posited "It is independence and risk bearing with respect to gasoline sales that is germane to application of the PMPA." *A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC,* 2018 U.S. Dist. LEXIS 219308 (E.D.N.Y. Mar. 5, 2018)(Unpublished) *citing Sigmon v. Widenhouse Service, Inc.,* 638 F.Supp. 808, 812 (M.D.N.C. 1986).

Immediately standing out on the face of the Agreement alone, and different from the facts in *Farm Stores,* is the substantial rent in the amount of $10,437.00 per month that the Plaintiff pays to the Defendants. The rent also escalates annually. In addition to paying rents, Plaintiff is responsible for all utilities. Plaintiff also has substantial maintenance responsibilities. See Exhibit "A" – Maintenance Schedule. These facts alone differ substantially from *Farm Stores*

and the District Court's application of the PMPA in *Hudson Petroleum Realty, LLC.*, where there the Plaintiffs were not found to be constructive retailers.

Most importantly, and a fact in opposite to the facts in *Farm Stores*, is that **the Plaintiff here paid a substantial sum, $360,000.00 for the business.** Nothing can come close to demonstrating entrepreneurial responsibility and risk like a large cash investment in a business. The sale of this business was publicly advertised. If the Defendants did not know that the agreements to operate its stations were being sold for large sums, it certainly should have known. Moreover, regardless of whether the Defendants knew about the transaction, it certainly demonstrates the Plaintiff's risk taken and need for the protections of the PMPA. Accordingly, the Plaintiff is a "retailer" within the meaning of the PMPA.

*The Standard for Injunctive Relief*

The PMPA "establishes a liberal standard for the issuance of a preliminary injunction." *Lyons v. Mobil Oil Corp.,* 526 F.Supp. 961, 968 (D.Conn. 1981); *Khorenian v. Union Oil of Calif.*, 761 F.2d 533, 535 (9th Cir. 1985). That relaxed injunction standard "was designed to benefit the small retailer;" and the Act was "intentionally drawn to facilitate the grant of injunctive relief." *Barnes v. Gulf Oil Corp.,* 824 F.2d 300, 306 (4th Cir. 1987). The standard for injunctive relief under the PMPA is found in Sec. 2805(b)(2) which states:

> Except as provided in paragraph (3), in any action under

> subsection (a) of this section, the court shall grant a preliminary injunction if -
> (A) the franchisee shows -
> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party is not renewed, and
> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C. §2805(B)(2).

Irreparable harm need not be shown, however the mere loss of a franchise has been held to be irreparable harm. *Stenberg v. Checker Oil Co.,* 573 F.2d 921 (6th Cir. 1978). In addition, a Plaintiff need not show a probability on the merits, only a reasonable chance of success. *Saad v. Shell Oil Co.,* 460 F.Supp. 114, 116 (E.D. Mich. 1978). The court must balance the potential hardships. "If the hardships imposed upon the franchisor by the issuance of an injunction would be less than those which would be suffered by the franchisee in the absence of such relief, the court should grant the preliminary injunction." *Wesley v. Mobil Oil Corp.,* 513 F. Supp. 227, 229 (E.D. Pa. 1981). "Under the PMPA, in an action for preliminary injunction brought by the franchisee, the franchisor has the burden of going forward, demonstrating that the termination or nonrenewal was permissible under the Act and that it has complied with the Act's notice requirements." *Id*.

In evaluating the standard for injunctive relief set forth in Section 2805, it is without question that the franchise in question has been terminated. See Exhibit "C." The Agreement in question is a franchise agreement under the

meaning of the PMPA if this Court finds that Plaintiff is a "retailer" under the terms of the Act. That question, whether Plaintiff's argument that it is a constructive retailer under the framework set forth in *Farm Stores*, certainly satisfies the statutory requirement of Section 2805 for there to be "serious questions going to the merits to make such questions a fair ground for litigation." If Plaintiff is a retailer within the meaning of the PMPA, Section 7 of the Agreement permitting the Defendants to terminate the Agreement upon 30 days notice and without cause is unlawful under the PMPA as are the required waivers of the Act's applicability.

Plaintiff is going to lose its business on August 6th if this injunction is not granted. Included in this is their substantial monetary investment of $360,000.00. The loss of the franchise and their investment certainly weighs in their favor when this Court evaluates that hardships when granting injunctive relief. Conversely, Defendants seek to merely terminate the agreement without cause, not related to any alleged incident or negligent operations by the Plaintiff. Defendants would suffer no hardship if the injunction is granted.

### IV. CONCLUSION

A preliminary injunction should be issued to maintain the status quo during the pendency of the litigation because there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation.

### V. AN EXPEDITED HEARING IS RESPECTFULLY REQUESTED

The notice of termination in this matter states a surrender date of August 6, 2025. A hearing is requested before that date. Also attached hereto as Exhibit

"D" is the affidavit of Philip Samuel.

                                              Respectfully submitted,

                                              /s/Donald Benedetto
                                              GAMBURG & BENEDETTO
                                              By:  Donald Benedetto, Esquire
                                              Atty. I.D. #309199
                                              1500 JFK Blvd., Suite 1203
                                              Philadelphia, PA 19102
                                              (215) 567-1486
                                              (215) 940-6661 (fax)
                                              don@gamburglaw.com
                                              Attorney for E-Plaintiff:
                                              Rehoboth Petroleum Inc.