**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **REHOBOTH PETROLEUM, INC.,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO.  25-3746** |
| **PETROLEUM MARKETING GROUP, INC.,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION AND ORDER**

**Rufe, J.**                                                    **October 6, 2025**

Plaintiff Rehoboth Petroleum, Inc. ("Rehoboth") brings this action against Defendant Petroleum Marketing Group Inc. and Defendant PMIG DPNJ LLC, arguing that the Defendants violated the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801-2841, by terminating the parties' Commission Agent Agreement without proper notice and without cause. Along with its Complaint, Rehoboth filed an Emergency Motion for Preliminary Injunction to prevent the Agreement from terminating.[1] Pursuant to an agreement between the parties, the Court entered an order on July 30, 2025, extending the final date of the Agreement from August 6, 2025, to October 6, 2025, and providing for business operations to proceed during that time without any changes to the Agreement.[2] After a hearing, the Court now considers whether to grant Rehoboth's motion for a preliminary injunction. For the reasons discussed below, the motion will be denied without prejudice. However, a preliminary injunction will be granted enjoining the Defendants from evicting or otherwise causing Rehoboth to vacate the premises of

---

[1] Pl.'s Mot. Prelim. Inj. [Doc. No. 2].

[2] Order [Doc. No. 13].

the Circle K Market convenience store. The Court will also grant Rehoboth leave to amend its Complaint.

## I.    BACKGROUND

### A.    Factual Background

Rehoboth is a Pennsylvania Corporation operating a Gulf Gas Station and Circle K Market convenience store located at 201 Lancaster Ave., Devon, PA (the "Site").[3] Defendant Petroleum Marketing Group, Inc. is the holder of a license, franchise, or other authorization to operate the same gas station. Defendant PMIG DPNJ LLC is affiliated with Petroleum Marketing Group and owns the real property where the gas station and convenience store are located.[4] Collectively, the Defendants are known as "PMG." Rehoboth and PMG are parties to the Commission Agent Agreement ("Agreement") under which PMG permits Rehoboth to operate the gas station and convenience store as an independent contractor.[5]

After seeing a business advertisement displaying the gas station and convenience store for sale as one business entity, Rehoboth purchased and began operating the business.[6] Rehoboth's purchase of the business represented a significant financial investment. In total, Rehoboth paid $360,000 to the previous business owner for the business, $67,000 to the previous owner for inventory, an initial $50,000 fee to PMG, and a separate additional fee to Circle K.[7] In addition to paying these fees, Rehoboth obtained the necessary approval from both PMG and

---

[3] Hr'g Tr. at 11 [Doc. 26]; Stip. Undisput. Facts ¶ 3.

[4] Hr'g Tr. at 68, 117 [Doc. No. 26].

[5] Pl's. Ex. 4A [Doc No. 2-2].

[6] Hr'g Tr. at 13 [Doc. No. 26].

[7] Hr'g Tr. at 21 [Doc. No. 26]; Pl.'s Ex. 4B [Doc. No. 2-3].

from Circle K.[8] On February 1, 2022, Rehoboth began operating the gas station and convenience store.[9]

      In operating of the gas station, Rehoboth does not purchase gasoline from PMG but rather sells gasoline on behalf of PMG at the pricing that PMG sets.[10] When fuel is transferred from PMG to Rehoboth, PMG retains title to the fuel and pays taxes on the fuel.[11] PMG insures the fuel and the Site, and bears the risk of loss with respect to fuel unless the loss is caused by Rehoboth.[12] PMG pays for necessary fuel permits, bears the cost of replacing equipment, sets gasoline prices, owns the point-of-sale equipment for fuel transactions, and assumes the risk of gasoline price fluctuations.[13] PMG owns all real property at the Site as well as all fixtures including gas pumps, gas tanks, signage, and lighting.[14] PMG also pays property taxes for the Site.[15] For its sales of gasoline, Rehoboth receives a $0.05 commission per gallon.[16] During its operation of the gas station and market, Rehoboth has paid PMG approximately $10,000 per month in rent, subject to two percent increases each year.[17] Rehoboth is also responsible for paying utilities and performing maintenance tasks, cleaning, and landscaping.[18]

---

[8] Hr'g Tr. at 11, 12, 21 [Doc. No. 26].

[9] Hr'g Tr. at 12 [Doc. No. 26].

[10] Compl. ¶ 17 [Doc. No. 1]; Hr'g Tr. at 23 [Doc. No. 26].

[11] Stip. Undisput. Facts ¶ 5.

[12] Stip. Undisput. Facts ¶ 5.

[13] Stip. Undisput. Facts ¶ 5.

[14] Stip. Undisput. Facts ¶ 4.

[15] Hr'g Tr. at 58 [Doc. No. 26].

[16] Stip. Undisput. Facts ¶ 7.

[17] Hr'g Tr. at 24 [Doc. No. 26].

[18] Stip. Undisput. Facts ¶ 11.

On July 30, 2024, PMG and Rehoboth entered into a Commission Agent Agreement that PMG drafted, and that Rehoboth agreed to without consulting counsel.[19]  The parties stipulate to the fact that this Agreement is in force for a term running from February 1, 2025, until January 31, 2028.[20] The second paragraph in the Agreement demonstrates a careful attempt by PMG to circumvent Rehoboth's protections under the PMPA[21]. It reads:

> **THE PARTIES SPECIFICALLY AGREE AND ACKNOWLEDGE THAT (1) ALL RIGHTS OF THE PARTIES ARE SET FORTH IN, AND CONTROLLED SOLELY BY, THE TERMS OF THIS AGREEMENT, AND (2) THERE IS NO EXPECTATION THAT THIS AGREEMENT WOULD OR COULD CREATE A FRANCHISE RELATIONSHIP AND/OR CONFERS ANY RIGHTS UNDER EITHER THE PETROLEUM MARKETING PRACTICES ACT (15 U.S.C. §§ 2801 ET SEQ.) OR ANY STATE-ENACTED FRANCHISE PRACTICES ACT.[22]**

Next, in Section 7 of the Agreement, PMG designed a mechanism whereby they could terminate the Agreement at will with minimal notice:

### 7. DURATION

> PMG in its sole discretion has the option to terminate this Agreement at any time and without cause upon thirty (30) days' written notice to Agent.[23]

This section also denotes that its termination clause is not subject to rights conferred by the PMPA.[24] Section 9 offers an additional method under which either party may terminate the Agreement. It reads:

### 9. TERMINATION

> In the event of any breach of this Agreement or any other agreement between the parties by either party, the non-breaching party may give written notice of said

---

[19] Pl.'s Ex. 4A.; Stip. Undisput. Facts ¶ 1.

[20] Pl.'s Ex. 4A; Stip. Undisput. Facts ¶ 1.

[21] 15 U.S.C. § 2801 et seq.

[22] Pl.'s Ex. 4A.

[23] Pl.'s Ex. 4A ¶ 7.

[24] *Id.*

> breach and demand that it be cured within five (5) days. If the breach is not cured within said five (5) day period, the non-breaching party, at its option, may terminate this Agreement upon five (5) days' written notice.[25]

The Agreement also addresses, among other things, Rehoboth's monthly rent, Rehoboth's maintenance and repair obligations, Rehoboth's status as "an independent contractor," PMG's ownership of motor fuel inventory, and PMG's obligations with respect to its fuel ownership, which includes paying taxes, maintaining licensing, and assuming the risk of loss from inventory.[26]

In March 2025, a PMG development district manager tasked with conducting on-site visits of stations operated by PMG's affiliates began observing what she believed were deficiencies in Rehoboth's maintenance of the gas station and convenience store.[27] In her site visits, the manager would spend eight hours visiting multiple sites in one geographical area and would observe from her car for two to three hours per site.[28] According to the manager, the convenience store operated by Rehoboth had vines on it, the Site's garbage was overflowing, and the Site's landscaping was deficient.[29] Rehoboth addressed some of these issues but not all of them.[30] For instance, the manager mentioned a landscaping issue to Rehoboth in April, and in early May the issue was not resolved.[31] On May 3, 2025, the manager sent the Rehoboth shareholder responsible for the daily operations an email identifying the landscaping issue, as

---

[25] Pl.'s Ex. 4A ¶ 9.

[26] Pl.'s Ex. 4A ¶¶ 8, 10, 16, 25, 28.

[27] Hr'g Tr. at 54, 70, 72 [Doc. No. 26].

[28] Hr'g Tr. at 70-71 [Doc. No. 26].

[29] Hr'g Tr. at 70-71 [Doc. No. 26].

[30] Hr'g Tr. at 73-74 [Doc. No. 26].

[31] Hr'g Tr. at 74 [Doc. No. 26].

well as other concerns,[32] and threatening Rehoboth that "if these items are not completed today, consequences includ[e] . . . terminating your [Agreement]." [33] PMG later hired its own landscaper to improve the landscaping.[34]

On July 7, 2025, PMG sent Rehoboth a "Notice of Termination," which purported to terminate the Agreement pursuant to Section 7 as of August 6, 2025.[35]

### B.    Procedural Background

Rehoboth filed a Complaint alleging that PMG's termination of the Agreement violated Rehoboth's rights under the PMPA.[36] On the same day that it filed the Complaint, Rehoboth also filed a Motion for Preliminary Injunction.[37] Before briefing the issues raised by the motion, the parties consented to a temporary extension of the Agreement until October 6, 2025.[38]

Once the motion was fully briefed, the Court held a preliminary injunction hearing at which the parties offered witness testimony and oral argument.[39] Rehoboth presented testimony from the shareholder of Rehoboth responsible for the gas station and convenience store's daily operation, and PMG introduced testimony from the PMG manager who conducted the site visits.[40] The Court admitted exhibits, including the parties' Commission Agent Agreement, the bill of sale connected to Rehoboth's purchase of the business, checks sent from Rehoboth to the

---

[32] The email also mentioned one loose pump topper, one expired pop, and excess dirt and grime present on the gasoline dispensers. Defs.' Ex. 1 [Doc. No. 18-1].

[33] Hr'g Tr. at 74 [Doc. No. 26]; Defs.' Ex. 1 [Doc. No. 18-1].

[34] Hr'g Tr. at 74 [Doc. No. 26].

[35] Hr'g Tr. at 23 [Doc. No. 26]; Pl.'s Ex. 4C [Doc. No. 2-4].

[36] Compl. ¶¶ 42-49 [Doc. No. 1].

[37] Mot. Prelim. Inj. [Doc. No. 2].

[38] Order [Doc. No. 13].

[39] Hr'g Tr. [Doc. No. 26].

[40] Hr'g Tr. at 10, 97 [Doc. No. 26].

prior business owner, the July 7, 2025 termination notice and the PMG manager's May 3, 2025, email notifying Rehoboth of landscaping deficiencies.[41]

## II.   LEGAL STANDARD

The Court must generally consider four factors when deciding whether to grant a preliminary injunction:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction].[42]

In the PMPA context, where a party moves for a preliminary injunction "in order to preserve the franchise relationship while a termination dispute is litigated," courts apply a modified framework.[43] To obtain a preliminary injunction enjoining the termination of a franchise agreement under the PMPA, the franchisee must show that:

> (1) the franchise of which it is a party has been terminated; (2) there "exist serious questions going to the merits to make such question a fair ground for litigation;" and (3) the hardship a preliminary injunction would place on the franchisor "will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted."[44]

By comparison, the PMPA "provides a lower threshold for obtaining a preliminary [injunction] than ordinarily required under the Federal Rules of Civil Procedure."[45]

---

[41] Pl.'s Exs. 4A-4D; Defs.' Ex. 1; Hr'g Tr. at 49, 50, 80 [Doc. No. 26].

[42] *Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *A.T.&T. Co. v. Winback & Conserve Program, Inc*., 42 F.3d 1421, 1427 (3d Cir. 1994)). In weighing the factors, the Third Circuit explained that the movant "must establish the first two factors and only if these 'gateway factors' are established does the district court consider the remaining two factors." *Id.* A likelihood of prevailing on the merits demands "a showing significantly better than negligible but not necessarily more likely than not."[42] *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). With respect to irreparable harm, however, the movant must show that the anticipated irreparable harm is more likely than not. *Id.*

[43] *Hillmen, Inc. v. Lukoil N.A.*, 985 F. Supp. 2d 657, 664 (E.D. Pa. 2013).

[44] *Id.* (quoting 15 U.S.C. § 2805(b)(1, 2)).

[45] *Id.* (citing *Brownstein v. Arco Petroleum Prods. Co.*, 604 F. Supp. 312, 314 (E.D. Pa. 1985)).

### III.   DISCUSSION

As it concerns the second, third, and fourth prongs of a preliminary injunction analysis, the Court notes at the outset that Rehoboth has met its burden. Concerning potential harm to each side, Rehoboth would suffer greater irreparable harm in the absence of a preliminary injunction than PMG would suffer if one were granted. According to the testimony of Rehoboth's testifying shareholder, whom the Court finds credible, Rehoboth invested approximately $500,000 to obtain the gasoline and convenience store businesses, both which stand to lose without an injunction.[46] By comparison, PMG failed to show any concrete harm that would arise if it were enjoined from terminating the Agreement, and the testimony of the PMG manager revealed that Rehoboth has operated the gas station effectively and has "been following all of [her] observations" in the period since this lawsuit was filed.[47] Furthermore, a decision enabling Rehoboth to continue operating all or a portion of its business promotes the public interest in safeguarding the expectation of smaller gasoline station operators who, as the PMPA envisions, have inferior bargaining power in comparison to large oil franchises that have the ability to set the terms of both the operator's sale of fuel and the operator's lease of real estate premises.[48]

Yet, as the parties' briefing indicates, the threshold issue in this case is whether the relationship between Rehoboth and PMG is a "franchise relationship" and thereby covered by the PMPA.[49] If Rehoboth cannot prove that it is a "franchisee" under the PMPA, it will not prevail on its PMPA claim, and the modified preliminary injunction test will be inapposite.

---

[46] Hr'g Tr. at 21, 45 [Doc. No. 26]. *See Stenberg v. Checker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978) ("[I]rreparable harm may be established by a franchisee . . . by proof of financial losses from withholding or revoking a franchise or lease.").

[47] Hr'g Tr. at 75 [Doc. No. 26].

[48] *See* S. Rep. No. 95-731, at 17, *as reprinted in* 1978 U.S.S.C.A.N. 873-74.

[49] *See* 15 U.S.C. §§ 2801-2802.

In the second paragraph of the Agreement, PMG attempts to contract around Rehoboth's statutory protections through language disavowing the creation of either a franchise relationship or any rights under the PMPA.[50] This calculated move by PMG is of little weight here because, as Rehoboth observes, the PMPA states that franchise agreements may not release or waive rights under the PMPA.[51] Further, provided that Rehoboth meets the statutory definition of a "franchisee" in the PMPA, express language in the Agreement that says otherwise will not by itself be conclusive.[52]

Accordingly, the question before the Court is whether, under the PMPA's definition, Rehoboth qualifies as a "franchisee."

### A.    The Petroleum Marketing Practices Act (PMPA)

The PMPA was created to protect petroleum franchisees "from arbitrary or discriminatory termination or non-renewal of their franchises."[53] According to one Committee Report discussing the PMPA's rationale,

> The franchise relationship in the petroleum industry is unusual, in fact perhaps unique, in that the franchisor commonly not only grants a trademark license but often controls, and leases to the franchisee, the real estate premises used by the franchisee. In addition, the franchisor almost always is the primary, even exclusive, supplier of the franchisee's principal sale item: motor fuel.[54]

As a result, there is a "disparity of bargaining power" between the franchisor and franchisee resulting in contracts that "may translate the original disparity of bargaining power into continuing vulnerability of the franchisee to the demands and actions of the franchisor."[55] For

---

[50] Pl.'s Ex. 4A at 1 [Doc. No. 2-2].

[51] 15 U.S.C. § 2805(f); Mem. Law. Supp. Pl.'s Mot. Prelim. Inj. at 6 [Doc. No. 2-1].

[52] *See Farm Stores, Inc., v. Texaco, Inc.*, 763 F.2d 1335, 1338-39 (11th Cir. 1985).

[53] S. Rep. No. 95-731, at 15, *as reprinted in* 1978 U.S.S.C.A.N. 873-74.

[54] *Id.* at 17.

[55] *Id.*

this reason, the PMPA generally provides that, if a franchise relationship exists, an agreement governing that relationship may be terminated only with 90 days' notice and for cause.[56]

Under the PMPA, a "franchise" is as any contract "(i) between a refiner and a distributor, (ii) between a refiner and a retailer, (iii) between a distributor and another distributor, or (iv) between a distributor and a retailer."[57] The parties agree that PMG qualifies a as distributor and that Rehoboth does not.[58] The issue is thus whether Rehoboth is a "retailer" for purposes of the statute. And, with regard to that issue, the Court acknowledges that the statutory definition and case law do not favor Rehoboth.

A "retailer" is "any person who purchases motor fuel for sale to the general public for ultimate consumption."[59] Courts have applied two methodologies to decide whether an entity fits this definition. The first approach relies entirely on the definition's plain language and, hence, considers simply whether an entity purchases motor fuel.[60] Rehoboth concedes that it does not meet this definition.[61] Under the second approach—the "constructive retailer" approach—courts analyze a multitude of factors to decide whether gasoline operators "have enough of the indicia of entrepreneurial responsibility and risk to be considered independent dealers and businessmen."[62] This approach became prevalent because, in line with the PMPA's legislative

---

[56] 15 U.S.C. §§ 2802(b)(2), 2804(a)(2).

[57] 15 U.S.C. § 2801(1)(A).

[58] Hr'g Tr. at 98 [Doc. No. 26]; Defs.' Opp. Mot. Prelim. Inj. at 9 [Doc. No. 18].

[59] 15 U.S.C. § 2801(7).

[60] *See Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 9-10 (2d Cir. 1982) (concluding that the legislative history of the PMPA did not give rise to a "clearly expressed legislative intent" to override the plain terms of the PMPA); *Douglas v. Petroleum Wholesale, Inc.*, 190 S.W.3d 97, 101-02 (declining to make a broad inquiry into the operator's "indicia of entrepreneurial responsibility" in favor of a stricter assessment of whether "the operator purchases motor fuel for sale to the general public").

[61] Mem. Law. Supp. Pl.'s Mot. Prelim. Inj. at 8 [Doc. No. 2-1].

[62] *Farm Stores,* 763 F.2d at 1346; *Automatic Comfort Corp. v. D&R Serv. Inc.*, 620 F. Supp. 1349, 1355 (analyzing the operator's status under the entrepreneurial responsibility test); *Johnson v. Mobil Oil Corp.*, 553 F. Supp. 195, 199 (S.D.N.Y. 1982) (same).

history, "Congress contemplated a broader definition of 'franchise' than is evidenced by the PMPA on its face."[63]

### B.    Whether Rehoboth is a "Constructive Retailer"

The parties recognize that *Farm Stores v. Texaco* is the foundational to the "constructive retailer" doctrine.[64] There, the Farm Stores operated a self-service gasoline outlet, carwash, and convenience store at a Texaco-owned site.[65] Pursuant to the contract between the parties, Texaco kept title to all gasoline products and agreed to pay Farm Stores a fixed hourly amount for its operation of the gas station, while Farm Stores agreed to pay station's utilities and was entitled to keep all proceeds from its food and carwash sales.[66]

After consulting some additional findings of the district court, the Eleventh Circuit held that Farm Stores did not qualify as a constructive retailer due to an absence of facts satisfying the "indicia of entrepreneurial responsibility" with respect to its gasoline sales.[67] The Court stressed that Farm Stores did not meet any of the following criteria:

> (i) pay for the gasoline inventory until it was sold;
> (ii) take title;
> (iii) pay ad valorem taxes on the gasoline inventory;
> (iv) bear the risk of loss of the gasoline (except for its own carelessness);
> (v) retain any funds from the sale of the gasoline to motorists;
> (vi) set the price or assume the market risk in fluctuations in gasoline prices;
> (vii) pay sales taxes or extend credit to motorists on resale; and
> (viii) hold a gasoline retailer's business license.[68]

---

[63] *Smith v. Atl. Richfield Co.*, 533 F. Supp. 264, 268 (E.D. Pa. 1982); *Sigmon v. Widenhouse Serv. Inc.*, 638 F. Supp. 808, 810-11 (M.D.N.C. 1986).

[64] Mem. Law. Supp. Pl.'s Mot. Prelim. Inj. at 9 [Doc. No. 2-1]; Defs.' Opp. Mot. Prelim. Inj. at 10 [Doc. No. 18]; *Farm Stores*, 763 F.2d at 1336.

[65] *Farm Stores*, 763 F.2d at 1337.

[66] *Id.* at 1337-38.

[67] *Id.* at 1344-46.

[68] *Id.* at 1340.

Here, the Agreement and the parties' stipulation of undisputed facts demonstrate that Rehoboth also does not satisfy any these indicators of independence with respect to the fuel component of its business.[69] Still, Rehoboth argues that it assumed other risks that warrant a different outcome than in *Farm Stores*. Among the risks that Rehoboth cites are its significant up-front payments to operate the business, totaling approximately $500,000; its monthly rent payments exceeding $10,000; and its entrepreneurial efforts with respect to the convenience store.[70] Rehoboth also argues that, in consideration of the lower standard for granting a preliminary injunction in the PMPA context, there is a "serious question[] going to the merits to make such question a fair ground for litigation."[71]

The Court disagrees with *Rehoboth* for two reasons. First, the scope of "entrepreneurial risk" identified in *Farm Stores* encompasses only risks with respect to the sale of motor fuel. This limitation on the "constructive retailer" doctrine is evident from *Hardwick v. Nu-Way Oil Co.*[72], which is cited in *Farm Stores*. In *Hardwick*, a husband and wife executed an agreement with Nu-Way Oil to operate a gasoline station.[73] They took on significant entrepreneurial—in fact, more than Rehoboth—by owning the land where the gas station was located and by constructing a small building on the land to serve as a drive-in grocery store.[74] Despite these entrepreneurial endeavors and the interrelationship between the gas station business and the

---

[69] Pl.'s Ex. 4A ¶ 25; Stip. Undisput. Facts ¶¶ 4, 5, 7, 11.

[70] Hr'g Tr. at 100-01, 104-05 [Doc. No. 26].

[71] Hr'g Tr. at 104 [Doc. No. 26].

[72] 589 F.2d 806 (5th Cir. 1979); *Farm Stores*, 763 F.2d at 1344.

[73] *Hardwick*, 589 F.2d at 807.

[74] *Id.* at 807-09.

convenience store business, the Fifth Circuit held that Hardwick and his wife were not independent because "the station operator had no independence *with regard to gasoline sales*."[75] Thereafter, courts have clarified that the "indicia of entrepreneurial responsibility" are relevant only insofar as those indicia concern the sale of gasoline, not the operation of a closely related convenience store business.[76] That notion was stated with additional clarity in *Johnson v. Mobil Oil Corp.*: "The fact that plaintiff is an independent businessman with regard to one aspect of the station's operation does not necessarily entitle him to the protections of the PMPA, which protects franchisees only with respect to the sale of motor fuel."[77]

Second, a multitude of courts considering similarly situated gasoline station operators have concluded that the risk factors raised by Rehoboth do not generate sufficient "indicia of entrepreneurial responsibility" to make those operators constructive retailers. To begin with, an operator's rent payments, while given attention by courts, have not prompted those courts to conclude that the operators were leading independent, entrepreneurial endeavors for purposes of the PMPA.[78] Courts have also declined to find adequate entrepreneurial responsibility in cases involving dual business like Rehoboth that involves both a gas station and a convenience store.[79] Further, even at the preliminary injunction stage, several district courts have denied motions for a

---

[75] *Id.* at 811 (emphasis added).

[76] *See Farm Stores,* 763 F.2d at 1345 ("If independence is the test, it must be independence with respect to the sale of motor fuel. There is absolutely no basis for assuming that Congress intended the PMPA to benefit independent grocers or carwash operators."); *Sigmon*, 638 F. Supp. at 812 ("It is independence and risk bearing with respect to gasoline sales that is germane to application of the PMPA.").

[77] 553 F. Supp. at 200.

[78] *See A&L Auto Repair, Inc. v. Hudson Petroleum Realty*, No. 17-cv-3529, 2018 WL 10517080, at *2, 9 (E.D.N.Y. Mar. 6, 2018); *Miller v. W.H. Bristow, Inc.*, 739 F. Supp. 1044, 1045-46, 1055 (D.S.C. 1990).

[79] *See Sigmon*, 638 F. Supp. at 812-13 (rejecting the plaintiff's argument that it was a constructive retailer based on "mix[ed]" entrepreneurial risk between a convenience store and a gas station); *A&L Auto Repair*, 2018 WL 10517080, at *6 (discounting risks that arose in the operation of convenience stores, automobile repair shops, and car washes).

preliminary injunction, including one Massachusetts district court that considered a case where, contrary to these facts, the plaintiff operator did briefly take title to the motor fuel as it passed through the gas pump.[80] Finally, even in an unusual scenario where an operator was scheduled to begin purchasing motor fuel for sale, a district court ruled that the operator was not covered by the PMPA because the purchases were centered around a travel center that had not yet been developed.[81]

To summarize, Rehoboth has not demonstrated either a likelihood or probability that it is a franchisee covered by the PMPA because the relevant *Farm Stores* factors are not present in this case, because the scope of entrepreneurial risk relevant to assessing the PMPA's applicability extends only to an operator's business with respect to its fuel, and because the applicable case law uniformly and consistently runs counter to Rehoboth's contentions, in respect to Rehoboth's business relationship with PMG. Accordingly, the Court will deny Rehoboth's motion for a preliminary injunction, as it relates to the termination of the Agreement with PMG and to the operation of the gas station portion of its business as an agent of PMG.

To be clear, the court's decision to deny Rehoboth's motion is not an approval of the contractual practices employed by PMG. PMG's contrived attempt to shirk Rehoboth's statutory protections through a PMPA waiver clause and fine-tuned provisions aimed at confirming PMG's ownership of its fuel potentially raise significant contractual concerns. Accordingly, the Court will grant Rehoboth leave to amend its Complaint. Rehoboth may therefore file additional

---

[80] *See Karak v. Bursaw Oil Corp.*, 147 F. Supp. 2d 9, 13-14, 16 (D. Mass. 2001); *see also Coral Grp. Inc. v. Shell Oil Co.*, No. 05-0633, 2005 WL 8159135, at *2 (W.D. Mo. July 19, 2005) (denying a motion for a temporary restraining order); *Johnson*, 553 F. Supp. at 201 (denying a plaintiff's motion for a preliminary injunction).

[81] *See DG Gas, LLC v. TA Franchise Sys.*, 2025 WL 8142928, at *15-16 (N.D. Oh. Mar. 14, 2025); *see also* Alois Valerian Gross, J.D., Annotation, *Who is "distributor" or "retailer" within meaning of § 101(6), (7) of Petroleum Marketing Practices Act (15 U.S.C.A. § 2801 (6), (7)),* 80 A.L.R. Fed. 871 (Originally published in 1986) (collecting cases rejecting the constructive retailer theory).

claims relating to its business relationship with Circle K, and the Court will grant a preliminary injunction prohibiting PMG from evicting or otherwise causing Rehoboth to vacate the premises of the convenience store, which Rehoboth operates independently of its Agreement with PMG, and for which Rehoboth faithfully pays rental fees to PMG, as well as maintenance fees and utilities fees.

## IV.    CONCLUSION

For the reasons stated above, the Motion for Preliminary Injunction will be denied without prejudice, but PMG will be enjoined from evicting or causing Rehoboth to vacate the premises of the convenience store. Rehoboth will also be given leave to amend its Complaint. An order will be entered.